UNITED STATES and State of New York ex rel. Xiomary Ortiz and Joseph Gaston, Plaintiffs,

v.

MOUNT SINAI HOSPITAL, Mount Sinai School of Medicine, and Mount Sinai Radiology Associates, Defendants.

13–CV–04735 (RMB) (BCM)

United States District Court, S.D. New York.

Signed 5/4/2016

ston (relators) allege that defendants Mount Sinai Hospital, Mount Sinai School of Medicine, and Mount Sinai Radiology Associates (collectively Mount Sinai) violated the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, and the New York State False Claims Act, N.Y. State Fin. L. §§ 187, *et seq.*, by overcharging both the federal Medicare program and the New York State Medicaid program for radiology services performed by the Mount Sinai Outpatient Radiology Department. Now before the Court are applications by both relators and defendants for discovery rulings, including rulings as to privilege and confidentiality.[1] On April 26, 2016, the Court held a conference and heard further argument regarding the applications, and now resolves the parties' disputes as set forth below.

Richard F. Bernstein, Timothy J. McInnis, Law Office of Timothy J. McInnis, New York, NY, for Plaintiffs.

Scott Roger Landau, Office of the General Counsel, Martin Tomas Murphy, Neil Stephen Binder, Wendy Helene Schwartz, Binder & Schwartz LLP, New York, NY, for Defendants.

## MEMORANDUM AND ORDER REGARDING DISCOVERY DISPUTES

BARBARA MOSES, United States Magistrate Judge

This is a *qui tam* action in which plaintiff-relators Xiomary Ortiz and Joseph Ga-

## BACKGROUND

Relators were and are employees of Mount Sinai. In August 2010, while working in the Radiology Billing Department, Ortiz reported to her employer that she was a victim of sexual harassment committed by Daniel Dorce, a director in the same department. *See* Am. Compl. (Dkt. No. 27) ¶ 19. Those allegations prompted an internal investigation by the Mount Sinai Labor Relations Department. In-house attorney Marina Lowy, Esq. worked on the sexual harassment investigation and provided related legal advice to Mount Sinai, including advice concerning potential harassment claims by Ortiz. *See* Joint Ltr. at 8. By August 25, 2010, Dorce was

---

1. In accordance with the Court's Scheduling Order dated February 10, 2016 (Dkt. No. 85), as modified on March 28, 2016 (Dkt. No. 115), the parties submitted their discovery applications in the form of a joint letter (the Joint Letter) dated March 29, 2016. In accordance with paragraph 1.D of this Court's Individual Practices, they delivered the Joint Letter directly to chambers, in lieu of filing it on ECF, because its attachments included various documents produced in discovery as "confidential" or "attorneys' eyes only." The Court has directed the parties to prepare a redacted version of their Joint Letter, omitting confidential material, for filing on ECF.

no longer employed at Mount Sinai. *See* Schwartz Decl. dated Dec. 17, 2014 (Dkt. No. 32), Ex. C. In March 2011, Lowy also advised Mount Sinai concerning threatened legal claims from another employee (the Employee), who was hired to replace Dorce in October 2010 and terminated in January 2011.

In September 2010, while the Ortiz sexual harassment investigation was ongoing, Ortiz and Gaston brought certain alleged billing misconduct to their employer's attention. According to Ortiz, Dorce was responsible for much of that misconduct. *See* Am. Compl. ¶¶ 56–64, 76–78, 96–101. In response to the billing practices allegations, Mount Sinai conducted another internal investigation and audit (collectively the Audit), culminating in a written report, later produced to the government. The Audit was conducted by the Audit & Compliance Services Department, advised and guided by in-house attorney Sally Strauss, Esq. *See* Joint Ltr. at 8. On March 3, 2011, after the Audit was concluded, Mount Sinai made certain voluntary repayments to the government. *Id.* Ex. C. Defendants have expressly waived any attorney-client privilege or work-product protection with respect to the Audit.[2]

On July 9, 2013, relators filed this action under seal (Dkt. No. 1), and on May 15, 2014, after the government declined to intervene, the seal was lifted. (Dkt. No. 6.) Prior to filing suit, relators, through their counsel, submitted a written disclosure statement to the government as required by 31 U.S.C. § 3730(b)(2) ("written disclo-

sure of substantially all material evidence and information the [potential relator] possesses shall be served on the Government"). Counsel prepared a supplemental written disclosure statement in July 2013, along with an annotated list of relevant documents presented to the government. In the fall of 2013, while the action was under seal, attorney Strauss made notes in preparation for a meeting with the government representatives investigating the billing practices allegations. Joint Ltr. at 9. In January 2014, Ortiz also met with the government, accompanied by her litigation counsel, who took notes of the interview. *Id.* at 4.

## DISCOVERY DISPUTES

### 1. *Defendants' Privilege Assertions.*

The attorney-client privilege "protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia,* 655 F.3d 126, 132 (2d Cir.2011) (citing *In re Cty. of Erie,* 473 F.3d 413, 419 (2d Cir.2007)). For the privilege to attach, the "predominant purpose of the communication" must be "to render or solicit legal advice." *In re Cty. of Erie,* 473 F.3d at 420. In the context of an internal investigation, however, that test "does not require a showing that obtaining or providing legal advice was the *sole* purpose of [the] investigation" nor that the communications at issue "would not have

**2.** *See* Jan. 21, 2016 Tr. at 17:11–14 (Dkt. No. 77) (defendants' counsel, confirming that Mount Sinai would produce "the entire internal audit file" in discovery); Feb. 9, 2016 Tr. at 15: 6–12 (Dkt. No. 88) (defendants' counsel, confirming that Mount Sinai would produce not only the audit report but also "underlying documents, such as interview summaries and notes," because "they're very

important to our defense"). Accordingly, the Court's Scheduling Order dated Feb. 10, 2016 (Dkt. No. 85) required defendants to produce the internal audit and investigation documents by February 19, 2016, including "all documents, witness interviews, notes and memoranda created as part of and in furtherance of the investigation."

been made 'but for' the fact that legal advice was sought." *In re General Motors LLC Ignition Switch Litig.*, 80 F.Supp.3d 521, 530 (S.D.N.Y.2015) (emphasis in the original) (quoting *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 759 (D.C.Cir. 2014)). As explained in *General Motors* :

> Rare is the case that a troubled corporation will initiate an internal investigation solely for legal, rather than business, purposes; indeed, the very prospect of legal action against a company necessarily implicates larger concerns about the company's internal procedures and controls, not to mention its bottom line.

80 ·F.Supp.3d at 530. The party invoking the attorney-client privilege, therefore, need only show that the provision of legal advice was a "primary purpose" of the investigation and of the communications as to which the privilege is claimed. *Id.*

■ The work product doctrine is codified, in large part, in Rule 26(b)(3)(A) of the Federal Rules of Civil Procedure, which provides that documents "prepared in anticipation of litigation or for trial" are discoverable only upon a showing of "substantial need" for the materials and a party's inability, without "undue hardship," to obtain their substantial equivalent by other means. Even where this showing has been made, Rule 26(b)(3)(B) cautions that the court "must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Documents or portions of documents that qualify as "opinion work product" are "entitled to virtually absolute protection." *United States v. Ghavami*, 882 F.Supp.2d 532, 540 (S.D.N.Y.2012).

■ The work product doctrine "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir.1998) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510–11, 67 S.Ct. 385, 91 L.Ed. 451 (1947)). To be eligible for work product protection, however, a document need not be prepared by a lawyer—Rule 26(b)(3)(A) expressly includes documents prepared "by or for [a] party or its representative"—and need not be created for the "primary purpose" of litigation, so long as it was prepared "because of" the prospect (or reality) of litigation. *Adlman*, 134 F.3d at 1202. Such a document "does not lose protection under this formulation merely because it is created in order to assist with a business decision." *Id. See also General Motors*, 80 F.Supp.3d at 532–33 (interview notes prepared during internal investigation into faulty ignition switches were "classic attorney work product," notwithstanding that the investigation was conducted for both litigation and business purposes). Documents prepared "in the ordinary course of business," however, that "would have been created in essentially similar form irrespective of the litigation," are not protected by the work product doctrine. *Adlman*, 134 F.3d at 1202.

■ Both the attorney-client privilege and the work product doctrine may be waived, either impliedly—such as by asserting an affirmative defense that puts in issue the contents of otherwise privileged materials—or expressly, such as by disclosing privileged materials to a government agency or deliberately producing them to a litigation adversary. In this case, as noted above, Mount Sinai's waiver is express and extends to "all documents, witness interviews, notes and memoranda created as part of and in furtherance of the [billing practices] investigation." That formulation is taken from *Koumoulis v. Independent Marketing Group, Inc.*, 295

F.R.D. 28, 41 (E.D.N.Y.2013) (quoting *Angelone v. Xerox Corp.*, 2011 WL 4473534, at *2 (W.D.N.Y. Sept. 26, 2011)). Both *Koumoulis* and *Angelone* were employment discrimination cases in which the defendant employer initially conducted an internal investigation in response to a complaint by an employee and thereafter, when the employee sued, put its internal investigation at issue by pleading the *Faragher–Ellerth* defense in its answer. *Koumoulis*, 295 F.R.D. at 40–41; *Angelone*, 2011 WL 4473534, at *3.[3] Thus, Mount Sinai has, in effect, expressly waived privilege to the same extent that a waiver would be implied by law from a litigation strategy that put the Audit in issue.

 The parties now disagree as to whether various documents that Mount Sinai has withheld from production, either in whole or in part, fall within the scope of its waiver. The burden is on the party resisting discovery to establish the facts necessary to show that the privilege applies and that it has not been waived. *General Motors*, 80 F.Supp.3d at 533; *see also Denney v. Jenkens & Gilchrist*, 362 F.Supp.2d 407, 412 (S.D.N.Y.2004). Because Mount Sinai's waiver is express, however, the Court need not determine whether, as relators contend, the Audit was undertaken primarily for "business and compliance purposes," Joint Ltr. at 2, and "the resulting materials would have been prepared in essentially the same form even if litigation were not contemplated," *id.* at 3, such that no privilege ever attached. Privilege has been waived. The Court need only determine whether and to what extent defendants have properly produced all communications and documents required by that waiver.

*a. Email Communications During the Billing Practices Audit Concerning the Ortiz Sexual Harassment Complaints.*

At issue are a series of redacted or fully withheld email communications concerning what are described as "employment/HR issues," including but not limited to the sexual harassment issues raised by Ortiz. *See* Defs'. Priv. Log (Joint Ltr. Ex. A), Nos. 97, 151–69, 173–79, 313–14, 321, and 327–60. Most date from the fall and winter of 2010, with a handful from early 2011 and one (No. 349) dated July 9, 2013. The July 9, 2013 entry and a few earlier entries (*e.g.,* Nos. 313, 314, 321) expressly reference the "Ortiz sexual harassment litigation," but most of the log entries do not specify the subject-matter of the emails beyond a general reference to "employment/HR issues" or "other litigation." Thus, the Court cannot determine whether the legal advice that is presumably sought or provided in these emails pertains to Ortiz, to other employees, or more generally to Mount Sinai's employment and HR policies. Many of the disputed emails were authored by or sent to attorney Lowy, who worked with the Labor Relations Department on the Ortiz sexual harassment allegations. Some, but not all, were also sent to attorney Strauss, who advised and guided the Audit.

Defendants contend that these communications are "outside the subject matter" of the Audit, Joint Ltr. at 8, because they

---

3. Pursuant to *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), an employer may, under certain circumstances, avoid vicarious liability in a hostile environment case by pleading and proving that it exercised reasonable care to promptly prevent and correct any harassing behavior and that the employee unreasonably failed to take advantage of the preventive or corrective opportunities provided by the employer. *See Angelone*, 2011 WL 4473534, at *2.

all relate to sexual harassment or other "HR" issues rather than the billing practices allegations that were the subject of the Audit. *See* Fed.R.Evid. 502(a) (intentional privilege waiver extends to additional undisclosed communications or information only if the disclosed and undisclosed materials "concern the same subject matter" and "ought in fairness to be considered together"). During the conference on April 26, 2016, defendants' counsel stressed that the Ortiz sexual harassment investigation and the Ortiz billing practices investigation were conducted by different attorneys in different departments, and downplayed the extent to which information concerning the sexual harassment investigation was communicated to Strauss or others in the Audit & Compliance Services Department. Counsel conceded, however, that Strauss reviewed unprivileged materials concerning the sexual harassment investigation and made some credibility judgments based on those materials.

Relators argue that the Ortiz sexual harassment investigation is necessarily intertwined with the Ortiz billing misconduct investigation. Relators note that the two investigations overlapped in time; that both involved allegations of misconduct by Dorce; and that it is clear from the privilege log that the Mount Sinai attorney conducting the billing misconduct investigation, Strauss, received at least some privileged information concerning the sexual harassment investigation from attorney Lowy (and others), which in some manner must have influenced the billing misconduct audit. Counsel also stated, at the conference, that early iterations of the written report on the billing practices investigation—which this Court has not seen—reference Ortiz's sexual harassment allegations as well. Therefore, relators contend, defendants' waiver of any privilege claim with respect to the billing mis-

conduct investigation necessarily extends to communications concerning the sexual harassment investigation, even if those communications would otherwise be protected by the attorney-client privilege or the work product doctrine. *See* Joint Ltr. at 2 ("[d]efendants cannot continue to assert the privilege to the extent that communications touch upon the subject-matter of the Internal Investigation").

■ The Court does not accept relators' broad conception of the linkage between the two investigations. Under Rule 502, undisclosed communications do not become discoverable unless (a) they "concern" the same subject matter as the waived communications and (b) ought, "in fairness," to be produced. More than a mere "touch" is required. There must be some reason to believe that the undisclosed communications underlay or influenced the Audit, or at least were among the materials that were considered in conducting the Audit and preparing the resulting report. Thus, in *Angelone*, the court held that the plaintiffs were entitled to see any otherwise-privileged communication or document "considered, prepared, reviewed, or relied on by Xerox in creating or issuing" the internal investigation report on which Xerox relied for its affirmative defense. 2011 WL 4473534, at *3. *See also In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir.2000) (after waiving privilege, a party cannot shield the "underlying communications" from scrutiny by the opposing party).

■ The present record does not permit the Court to determine which of the disputed emails meets this standard. Item 349, which is dated July 9, 2013, can be fairly easily ruled out on a temporal basis alone, and need not be produced. *See Angelone*, 2011 WL 4473534, at *3 (documents "created *after* the [internal in-

vestigation report]. was issued," and after the employee filed an EEOC complaint, did not fall within scope of waiver as to report) (emphasis in the original); *accord Asberry v. Corinthian Media, Inc.,* 2009 WL 3073360, at *2–3 (S.D.N.Y.2009). Similarly, items 167–68, which are dated March 2, 2011, and relate to the separate harassment allegations raised by the Employee, need not be produced. Emails sent prior to or during the Audit, however, may be discoverable, at least to the extent that they concern Ortiz herself and were sent to attorney Strauss, or to others in the Audit & Compliance Services Department who worked on the Audit. If these criteria are met—which cannot be determined from the privilege log alone—and if, as relators contend, early iterations of the billing services investigation report incorporate information from the supposedly separate sexual harassment investigation, it may well be that the disputed emails, or some subset of them, must "in fairness" be produced, because they were "considered, prepared, reviewed, or relied on" by Strauss or others in the conduct of the Audit.

Accordingly, defendants must promptly submit unredacted copies of Items No. 97, 151–166, 169, 183–179, 313–14, and 327–60 on their privilege log for *in camera* review by the Court, labeled to correspond with their privilege log listing, and accompanied by a description of the positions and roles of the various authors and recipients of the disputed emails. To further assist the Court in reviewing these emails, relators must promptly submit one or more (but not more than three) examples of documents previously produced that, in relators' view, demonstrate the intertwined nature of the two investigations. These documents may be delivered directly to chambers and should not be filed on ECF, but—except for the documents as to which privilege is claimed—should be served on

opposing counsel. Relators' documents may be marked to highlight the relevant portions. No additional argument should be submitted.

### b Attorney Notes Created After Plaintiff-Relators Filed This Action.

▮ Defendants have withheld five sets of notes created by attorney Strauss long after the Audit was completed. Four of them are dated in September 2013 and "summarize[e] counsel's legal advice . . . in the course of the current litigation." Defs'. Priv. Log Nos. 241, 261, 361, and 362. One set of notes is undated but summarizes counsel's legal advice "in anticipation of the current litigation." *Id.* No. 180. Defendants explain that these notes were created "in anticipation of a meeting with the Government." Joint Ltr. at 8.

Relators argue that the timing of these notes is not sufficient to render them immune from discovery, because they "incorporate the subject-matter of the investigation" and therefore fall within the scope of defendants' waiver as to the 2010–11 Audit. Joint Ltr. at 3. Alternatively, relators argue that since attorney Strauss will be a fact witness as to (among other things) the Audit, her post-litigation notes are subject to disclosure "to the extent that they touch upon the subject-matter of her testimony or are used to refresh her recollection." *Id.*

Relators are correct only to the extent that if defendants use Strauss's notes—or any other privileged documents—to refresh her recollection for the purpose of testimony, they may no longer withhold those documents from discovery. *See* Fed. R.Evid. 612; *Thomas v. Euro RSCG Life,* 264 F.R.D. 120, 122 (S.D.N.Y.2010) (notes were presumptively privileged, but "plain-

tiff waived that privilege when she relied on the notes in connection with her deposition testimony").[4]

 Absent a new waiver, however, the fact that the 2013 notes may "incorporate" or "touch on" the subject-matter of the 2010–11 Audit does not render them discoverable. As noted above, the waiver extends to documents "created as part of and in furtherance of" that Audit. *Koumoulis*, 295 F.R.D. at 41; *Angelone*, 2011 WL 4473534, at *2. Thus, documents that "underlie" the Audit, or that Mount Sinai "considered, prepared, reviewed, or relied on" in creating the Audit, *Angelone*, at *3, cannot be withheld as privileged. But the converse is not true. That is, the fact that Strauss may have "considered" or "reviewed" the subject-matter of the Audit (or the Audit itself) in preparing litigation-related notes two and a half years later does not strip those notes of the protections of the attorney-client privilege or the work product doctrine if otherwise applicable. *See Koumoulis*, 295 F.R.D. at 41 (waiver concerning pre-litigation internal investigation did not extend to later "EEOC charges or future litigation"); *An-*

*gelone*, at *3 (waiver concerning pre-litigation internal investigation did not extend to documents created after the internal report was issued); *Asberry*, 2009 WL 3073360, at *2 ("there is no justification for Plaintiff to look at the litigation communications, which occurred after her June 2007 termination and after her July 2007 filing of the charge of discrimination").[5] Indeed, the rule that relators seemingly endorse, taken to its logical conclusion, would eviscerate both the privilege and the doctrine forever—even for litigation counsel—once privilege has been waived with respect to a pre-litigation investigation or report concerning the subject of the lawsuit.[6]

Items No. 180, 241, 261, 361, and 362 on defendant's privilege log do not fall within the scope of the waiver concerning the Audit and need not be produced. By the same token, during Strauss's deposition, defendants may continue to assert the attorney-client privilege and/or the work product doctrine with respect to Strauss's otherwise-privileged communications, notes, and other documents reflecting her work in anticipation or defense of the present litigation.

4. The same rule would also apply, of course, to relators. *See, e.g., United States ex rel. Bagley v. TRW, Inc.*, 212 F.R.D. 554, 565–66 (C.D.Cal.2003) (portions of disclosure statement submitted to government by relators in False Claims Act case lost their work-product protection when relator reviewed those portions to refresh his recollection in preparation for his deposition).

5. *Asberry* drew the line at "June 30, 2007, sixteen days after [plaintiff's] termination," 2009 WL 3073360, at *3, but only because the waiver expressly encompassed counsel's advice concerning the termination decision itself and "[i]t may turn out that, during those sixteen days, [counsel] received additional information or conveyed somewhat changed advice." *Id. Asberry* does not assist relators in

their effort to obtain attorney Strauss's 2013 notes.

6. Relators' additional contention that Strauss's 2013 notes "were created primarily for business and compliance purposes," Joint Ltr. at 3, is both factually and legally wide of the mark. The defense of an actual *qui tam* action—regardless of whether the government intervenes—is "litigation," *see* Fed.R.Civ.P. 26(b)(3)(A), not "business and compliance." Moreover, the Second Circuit has discarded the "primary" purpose test for work product. *See Adlman*, 134 F.3d at 1202. Relators do not contend that Strauss's 2013 notes would "would have been created in essentially similar form irrespective of the litigation," *id.* and therefore cannot contend that the work product doctrine never attached to those notes.

c. *Attorney Notes and Emails Concerning Harassment Allegations by Another Employee.*

 Defendants have withheld six documents, all dated in March 2011 and prepared by or sent to attorney Lowy, concerning harassment allegations made by the Employee who was hired in October 2010 to replace Dorce and was terminated in January 2011. That Employee sent Mount Sinai a pre-litigation demand letter, through counsel, which was received on February 25, 2011, just two business days before the first of the disputed documents was created. Joint Ltr. Ex. D. Relators argue that the Employee is a "material witness" in the case. Joint Ltr. at 3. Be that as it may, her status as a witness does not render Lowy's notes and email discoverable if otherwise protected by the attorney-client privilege or the work product doctrine. Nor is there any evidence that the Employee was interviewed concerning either of the Ortiz investigations, much less that defendants "considered, prepared, reviewed, or relied on" the March 2011 documents concerning the Employee in preparing the Audit. This is not surprising, since the Employee was not hired at Mount Sinai until after the Ortiz sexual harassment investigation was concluded, and the Employee's demand letter, received when the billing practices investigation was complete (or nearly so), indicates that her concerns were quite different from those underlying the Audit.

Items No. 315–320 on defendants' privilege log do not fall within the scope of the waiver concerning the Audit and need not be produced.

**2. *Confidentiality Designations.***

The parties stipulated to a Consent Discovery Protective Order (Dkt. No. 53) that permits a producing party to designate a document either "Confidential" or "Attorneys Eyes Only" at the time of production. To qualify as Confidential, a document must contain trade secrets or other confidential business information; private or confidential personal or health information; information received in confidence from third parties; or information "which the producing party believes in good faith to be entitled to protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure." Prot. Order ¶ 2(d). Confidential documents are available to all counsel and parties, but cannot be filed on the Court's public docket and are subject to certain other restrictions. *Id.* ¶¶ 6–7. To qualify as Attorneys Eyes Only, a document must contain "highly sensitive business or personal information, the disclosure of which is highly likely to cause significant harm to an individual" or to the business or competitive position of the designating party. *Id.* ¶ 5. Attorneys Eyes Only documents may only be disclosed to counsel for the parties. *Id.* ¶ 9. Counsel may give advice to their clients based on their evaluation of the Attorneys Eyes Only material but may not reveal the content of such material to the clients. *Id.*

a. *"Attorneys Eyes Only" Designations.*

 Relators object to defendants' designation of two documents as Attorneys Eyes Only. The first is the demand letter that detailed the potential legal claims of the Employee hired to replace Dorce. Joint Ltr. Ex. D. The second is a lengthy memo prepared by a non-lawyer Mount Sinai employee, Jeff Cohen, summarizing the interviews that he and others conducted from August through October 2010 concerning the Ortiz sexual harassment allegations. *Id.* Ex. E. Defendants produced two versions of the Cohen memo: In the Confidential version, available to Ortiz and Gaston, the names of the witnesses who were interviewed (other than Ortiz, Gaston, and Dorce) are redacted, along with,

in some cases, the names of nonparty individuals mentioned during the interviews. The Attorneys Eyes Only Version is unredacted.

The Court agrees with defendants that the production of these two documents to the individual relators would be highly likely to harm non-party individuals, including the Employee (who was at one time a co-worker of Ortiz and Gaston) and the witnesses interviewed during the sexual harassment investigation (some of whom are still their co-workers). *See Chen–Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 557, 565–67 (S.D.N.Y.2013) (in class action alleging sex discrimination, court directed defendant to produce internal complaints made by putative class members but limited disclosure of the "unredacted names" of the complainants to counsel in order to protect the employees' privacy). Further, since both documents are available to relators' counsel without redaction, the Court cannot identify any significant prejudice that will result from upholding the Attorneys Eyes Only designations.

Defendants therefore need not re-designate either document.

b. *"Confidential" Designations.*

 Relators also object to defendants' designation of every document produced in discovery as Confidential (other than those designated as Attorneys Eyes Only), arguing that such a blanket designation is inconsistent with the language of the protective order and with the underlying dictates of Fed.R.Civ.P. 26(c)(1)(G). Joint Ltr. at 3. They do not object to the designation of certain categories of documents as Confidential—including those related to the Audit or claims documentation—but assert that the rest of the production contains "largely non-Confidential" material, such that defendants should, at a minimum, be required to review the documents individually and remove the Confidential designation from those that do not qualify for the label. *Id.* at 3–4. Defendants respond that "[t]his entire action involves highly sensitive confidential information and Defendants have marked their documents to be treated as such." *Id.* at 10.

 Relators are correct that, "[w]here the materials to be produced include a mix of protectable and non-protectable documents," the "initial determination as to what is and is not 'confidential'" should be made "by the producing party, which must review its documents and make a good-faith determination as to which of them meet the standards of Rule 26(c)(1)(G)." *Closed Joint Stock Co. "CTC Network" v. Actava TV, Inc.*, 2016 WL 1364942, at *4 (S.D.N.Y. Mar. 28, 2016). Thus, in *Houbigant, Inc. v. Development. Specialists, Inc.*, 2003 WL 21688243 (S.D.N.Y. July 21, 2003), the court held that defendant Deloitte "may not simply designate its entire production . . . as confidential. Deloitte may only designate documents within its production as confidential after making a good faith determination that there is a legitimate basis for a confidentiality designation." *Id.* at *4.

Here, as in *Houbigant*, it is clear that at least some of the documents produced by defendants in discovery were never properly designated Confidential, or can no longer be so designated after defendants filed them on the Court's public docket.[7] Defendants must, therefore, review those

---

7. Exhibit B to the Joint Letter, which is designated Confidential, was previously filed as Exhibit P to the Schwartz Declaration (Dkt No. 32–16). Exhibit F to the Joint Letter, which consists of a list of Mount Sinai radiologists with the dates on which they began and ended their employment, does not warrant protection under the Protective Order or Rule 26(c)(1)(G).

documents in good faith to determine whether there is a legitimate basis for their confidentiality designations. The Court recognizes that this may be a time-consuming task, even if limited to documents other than those as to which relators do not object to the designation. The Court also recognizes that the Confidential designation, which does not prevent either relators or their counsel from viewing the documents, creates only relatively minor logistical burdens for relators until such time as the parties engage in substantial motion practice or trial.

Defendants may therefore have until June 24, 2016 (the close of fact discovery) to complete their review and provide plaintiff-relators with a list, and new copies, of the previously-produced documents as to which they no longer claim confidentiality. Any documents produced after the date of this Order, however, shall be designated Confidential only after the producing party has made "a good faith determination that there is a legitimate basis for a confidentiality designation" for each document so designated. *Houbigant,* 2003 WL 21688243, at *4.

### 3. *Revenue Targets.*

■ Relators contend that the allegedly fraudulent billing practices at issue were undertaken, at least in part, in an effort to meet revenue targets set by defendants, and consequently seek all documents concerning "targeted, expected, anticipated and/or budgeted revenue from radiology services." Joint Ltr. at 4. Recognizing the potential burden of this request, relators state that they will limit their demand, "at this point," to "final, annual actual and projected revenue figures." *Id.* Defendants state that they previously agreed to produce documents, if any, "relating to Relators' allegation that Defendants undertook the alleged billing practices to reach revenue targets, and produced them to the extent they exist," but resist a broader production of revenue-related documents as "not proportional to Relators' allegations." *Id.* at 10.

As noted above, Relators' allegations of billing misconduct are limited to the Outpatient Radiology Department. During the April 26, 2016 discovery conference, defendants' counsel confirmed that the Outpatient Radiology Department was part of the larger Radiology Department within defendant Mount Sinai Faculty Practice Associates (FPA). Counsel was unsure, however, as to whether separate budgets or targets were prepared for the Outpatient Radiology Department. To the extent that final, annual, actual or projected revenue figures were prepared by or for the Outpatient Radiology Department during the calendar years 2007 through and including 2010, defendants are directed to produce the documents revealing those figures, as well as the final, annual, actual or projected revenue figures prepared by or for the Radiology Department as a whole during the same years. Absent a further showing of relevance and/or need, however, defendants are not required to produce actual or projected revenue figures for FPA or for the other entities named as defendants herein. On the present record, such discovery would exceed even the liberal relevance constraints of Fed.R.Civ.P. 26(b)(1).

### 4. *Relators' Section 3730(b)(2) Disclosure Statements and Related Documents.*

The federal False Claims Act requires the relator to serve the government with a copy of his or her complaint and "written disclosure of substantially all material evidence and information the person possesses." 31 U.S.C. § 3730(b)(2). The statute does not indicate whether the disclosure

statement is entitled to any protection from discovery. At issue here are relators' March 17, 2013 disclosure statement, their July 7, 2013 supplemental disclosure statement, and their July 13, 2013 "document list with attorney annotations," all apparently submitted to the government pursuant to § 3730(b)(2). Defendants seek production of the "factual portions" of these documents, along with the factual portions of the handwritten notes prepared by relators' counsel of the "Xiomary Ortiz proffer," that is, the government's interview of Ortiz on January 9, 2014. *See* Rel. Priv. Log (Joint Ltr. Ex. G), Nos. 1–4.

Defendants argue that the attorney-client privilege does not apply to these documents at all and that the work product doctrine, while applicable, permits discovery of the factual portions of the documents, which are at best "ordinary work product," on a showing of substantial need. Joint Ltr. at 6–7. In this case, defendants argue, they need the documents in order to test the extent to which Ortiz "withheld information from Defendants" but later presented it to the government. *Id.* at 7. Additionally, defendants seek to use the disclosure statements and related documents to test Ortiz's credibility by comparing her government presentation to "the information she represented to be everything she knew in sworn statements she provided to Defendants." *Id.*

Relators, unsurprisingly, take the position that all four of the withheld documents constitute opinion work product, and that even if some portions are characterized as ordinary (or "factual") work product, defendants have not made the necessary showing of a substantial need, coupled with an inability to obtain substantially equivalent information through other

means, required by Fed.R.Civ.P. 26(b)(3)(A)(ii) before ordinary work product becomes discoverable. Joint Ltr. at 5.[8] Relators do not directly address either of the arguments that defendants make as to their substantial need for the documents.

The Second Circuit has not spoken on this issue, and the district courts are split. Some courts have ruled that § 3730(b)(2) disclosure statements are neither privileged nor protected by the work product doctrine. *See, e.g., United States ex rel. Robinson v. Northrop Corp.,* 824 F.Supp. 830, 838–39 (N.D.Ill.1993) (since "plaintiffs have already turned the document over to a non-party, the government," and since, "in any event, § 3730(b)(2) requires only a statement of facts," production of the disclosure statement should be compelled). *See also United States ex rel. Burns v. A.D. Roe Co.,* 904 F.Supp. 592, 594 (W.D.Ky.1995) (requiring production of disclosure statement because it is "simply a recitation of factual information," as to which "the need for protection is minimal," while "Defendant's need for this document is great" because "nowhere else can Defendant obtain a more detailed summary of its alleged wrongdoing").

Other courts take a more nuanced view, agreeing that a disclosure statement qualifies as work product but assessing the degree of protection required, and the defendant's asserted need, on a case-by-case basis. Thus, in *United States ex rel. Hunt v. Merck–Medco Managed Care, LLC,* 2004 WL 868271, at *2 (E.D.Pa.2004), the court held that the relators' disclosure statements were prepared for litigation and therefore constituted work product. Without resolving the question of "factual work product, as opposed to opinion work

---

**8.** Although relators relied in part on the attorney-client privilege to withhold these documents from production, *see* Rel. Priv. Log, Nos. 1–4, they do not pursue that point in the Joint Letter.

product," the court held that defendants had not shown a "substantial need" for the disclosure statements because, among other things, they were about to depose the relators themselves and the factual bases of their claims "should certainly become known as discovery proceeds." *Id. See also United States ex rel. Fisher v. Ocwen Loan Servicing LLC,* 2015 WL 4609742, at *3–4 (E.D.Tex. July 31, 2015) (holding that disclosure statements constituted "at least ordinary work product," the protection of which "was not waived when Relators disclosed the information to the Government as the common-interest doctrine applies," and that defendant had not established a substantial need for the documents because it "has the opportunity to question Relators regarding the information contained within their allegations and their investigative efforts"); *United States ex rel. Burroughs v. DeNardi Corp.,* 167 F.R.D. 680, 684–85 (S.D.Cal.1996) (holding that an *in camera* review would be required to determine whether disclosure statement contained ordinary or opinion work product); *cf. United States ex rel. Stone v. Rockwell Int'l Corp.,* 144 F.R.D. 396, 401 (D.Colo.1992) (holding, after an *in camera* review, that plaintiff's disclosure statement was factual work product, and that defendant had a substantial need for the statement because plaintiff "has provided little in the way of discovery which

would reveal the factual basis for the allegations in the complaint," and trial was just four months away).[9]

At least one court—though not in this circuit—has held that even the "factual portion" of a § 3730(b)(2) disclosure statement should be considered opinion work product, because "the selection, organization, and characterization of facts reveals the theories, opinions, or mental impressions of a party or the party's representative," which "qualifies as opinion work product." *Bagley,* 212 F.R.D. at 563. Moreover, according to *Bagley,* disclosure statements should be classified as opinion work product *ex ante*—rather than waiting to perform an *ex post* review in the context of a discovery motion—in order to further the public policy behind the False Claims Act. The court reasoned that such a bright-line rule, precluding discovery of all portions of disclosure statements, would "encourage[ ] relators to include everything that might help the government in evaluating the case, secure in the knowledge that whatever is written will not be seen by the defendant." *Id.* at 565[10]

■■■ This Court is not prepared to endorse the *Bagley* bright-line rule. Relators' disclosure statements qualify as work product under Rule 26(b)(3)(A), because they were prepared in anticipation of litigation and disclosed (thus far) only to the government, with which they share a com-

9. In this district, the Hon. Barbara Jones quashed a subpoena, addressed to the U.S. Attorney's Office, seeking production of "three boxes containing documents provided to the Government by the relator's counsel" in connection with a *qui tam* action that was still, at the time of the subpoena, under seal. *In re Subpoena to the U.S. Attorney's Office, S. Dist. of N.Y.,* 2000 WL 45726, at *1 (S.D.N.Y. Jan. 20, 2000). In quashing the subpoena, Judge Jones relied principally on the law enforcement privilege, noting that the documents would "(1) reveal defendants as yet unnamed; (2) uncover methods and details of the investigation; and (3) compromise settle-

ment negotiations." *Id.* The court noted, however, that once the investigation ended "the documents would remain protected only by the work product privilege," at which point the petitioner would be required make a "stronger showing of need" in order to gain access to the documents. *Id.*

10. As noted above, however, *Bagley* ultimately required the production of portions of the disclosure statement because the relator reviewed it prior to deposition in order to refresh his recollection. 212 F.R.D. at 566.

mon interest. *See Burroughs*, 167 F.R.D. at 686 (in a False Claims Act case, "plaintiff and the government essentially stand in the same shoes as against the defendants"). Whether the disclosure statements consist of ordinary or opinion work product, however, and in what proportions, cannot be determined on the present record. *See id.* at 684. Thus, if the defendants could demonstrate that they have a substantial need for the presumptively privileged documents and that they cannot, without undue hardship, obtain the substantial equivalent by other means, Fed. R.Civ.P. 26(b)(3)(A)(ii), the Court would be required to review the disclosure statements *in camera* to determine whether production is required.

At present, no such review is necessary, because defendants have not made a persuasive showing of need or hardship. To be sure, defendants are entitled to know "the factual bases of the Relators' claims," *Hunt*, 2004 WL 868271, at *2, including whether and to what extent those claims are based on information that Ortiz knew but failed to disclose to defendants during the Audit. There is no reason to believe, however, that defendants are unable to investigate this issue—and, more generally, the issue of the relators' credibility—without access to their work product. As in *Fisher* and *Hunt*, defendants have the full range of ordinary discovery available to them, including depositions of both Ortiz and Gaston, where they will have an opportunity to question the relators "regarding the information contained within their allegations and their investigative efforts." *Fisher*, 2015 WL 4609742, at *4. *See also Hunt*, 2004 WL 868271, at *2 (defendants will have "ample opportunity over the course of the next several months to discover, with specificity, the facts and individuals most important to their case").

Nor are defendants entitled to the notes prepared by relators' attorneys of Ortiz's government interview (Rel. Priv. Log No. 4). Notes of a client or witness interview conducted in anticipation of litigation or for trial "easily fit within the protection of the work-product doctrine." *S.E.C. v. Strauss*, 2009 WL 3459204, at *4 (S.D.N.Y. Oct. 28, 2009). *See also Hickman v. Taylor*, 329 U.S. at 510–11, 67 S.Ct. 385 (holding that attorney notes of interviews with witnesses to event underlying lawsuit were not discoverable by the plaintiff); *General Motors*, 80 F.Supp.3d at 532 (interview notes are "classic attorney work product"). If the notes include or reveal the "mental impressions, conclusions, opinions, or legal theories" of counsel—as attorney notes tend to do—they would constitute opinion work product. *See* Fed.R.Civ.P. 26(b)(3)(B). The fact that the interview was conducted by the government, rather than by Ortiz's personal counsel, is irrelevant to the work product analysis, which turns on the author and nature of the notes, not the identity of the interviewer. And while the proffer notes, like the disclosure statements, could potentially provide impeachment material, that possibility does not furnish the "substantial need" that is necessary to overcome the protection of the work product doctrine. *See S.E.C. v. Treadway*, 229 F.R.D. 454, 456 (S.D.N.Y.2005) (denying motion to compel production of notes concerning witness proffer sessions conducted by SEC attorneys because, among other things, "[d]efendants are free to question each of the witnesses at their depositions, and at trial, concerning the witnesses' statements to the SEC at various proffer sessions").

Defendants are, however, entitled to relators' document index (Rel. Priv. Log No. 3), redacted to remove the attorney comments and annotations. Aside from the annotations, the index merely lists the

documents that relators provided to the government—copies of which relators agree they have already produced, *see* Joint Ltr. at 4 n.2—and therefore is not privileged or protected by the work product doctrine.

## CONCLUSION

For the reasons set forth above:

1. It is hereby ORDERED that defendants promptly submit unredacted copies of Items No. 97, 151–166s, 169, 183–179, 313–14, and 327–60 on their privilege log for *in camera* review by the Court, labeled to correspond with their privilege log listing, and accompanied by a description of the positions and roles of the various authors and recipients of the disputed emails.

2. It is further ORDERED that relators promptly submit one or more (but not more than three) examples of documents previously produced that, in relators' view, demonstrate the intertwined nature of the two investigations. Relators' documents may be marked to highlight the relevant portions, but no additional argument should be submitted.

3. It is further ORDERED that defendants review their document production to ensure that there is "a legitimate basis for a confidentiality designation" for each document designated Confidential, and provide plaintiff-relators, on or before June 24, 2016, with a list and new copies of the previously-produced documents as to which they no longer claim confidentiality.

4. It is further ORDERED that defendants produce, as soon as reasonably practicable, documents evidencing or revealing final, annual, actual or projected revenue figures prepared by or for the Outpatient Radiology Department and the Radiology Department as a whole during the calendar years 2007 through and including 2010.

5. It is further ORDERED that relators promptly produce their document index (item No. 4 on their privilege log) to defendants, redacted to remove all attorney commentary or annotations.

All other relief sought in the parties' Joint Letter is denied.

SO ORDERED.